United States District Court
Northern District of Illinois



**1:20-cv-04019**
**Judge Jorge L. Alonso**
**Magistrate Judge Young B. Kim**

FILED

JUL 09 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

}
}
Del Signore  v.  NOKIA  of America    }        Dept. of Labor case #: 2019CFP00001[1]
}
}            Jury Trial Demanded
}
}

Now and here comes before this court Plaintiff Dr. Kenneth Del Signore to bring charges against

the Defendants for employment harassment, discrimination and termination that resulted after

the plaintiff uncovered and reported evidence that showed a wire fraud was being committed by

Verizon in order to cause false claims to be made to the US government, which then cause

inflated federal subsidies to be paid to a network of politically connected shell corporations in all

50 states.


Contents:

|  | paragraph: | |
| --- | --- | --- |
|  | 1 | introduction |
|  | 12 | jurisdiction |
|  | 15 | parties |
|  | 24 | allegations |
|  | 59 | charges |
|  | 63 | requested relief |
|  | 64 | list of attachments |

---

[1] search box:  https://www.oalj.dol.gov/#

United States District Court
Northern District of Illinois

Introduction

-------------------------

1:  This matter concerns the fraud in the Universal Service Fund, which is a federal subsidy regime that collects approximately $1.50 per month from every US phone bill.   This collected money is then distributed to a network of 2400 small telecom corporations that all do three things in common:

   A)  they receive USF subsidies for telecom services they provide in remote areas

   B)  they rent equipment from the large telecom companies to provide these services

   C)  executives at these 2400 companies  (+ spouses)   make large annual contributions to congresspersons.


2:  In 2009, while working at Nokia (then named Lucent) as an industry leading expert in the field of telecommunications system performance, the plaintiff uncovered an anomaly in the performance of Verizon's switching systems that were providing cellular telephone data service in the United States.   Nokia is the manufacturer of these systems and at that time was under contract with Verizon for performance optimization of these cellular switching  systems.


3: This performance anomaly turned out to be evidence of a wire fraud being committed by Verizon in order to cause increased messaging between cellular phones and cell towers. Counts of these messages are  reported to the government and USF subsidies are paid out based on the number of messages sent between the cell phones and towers.  By inflating the messages between the phones and the towers, government subsidy payments are fraudulently increased.

United States District Court
Northern District of Illinois

4: In 2009, the true nature of the anomaly was unknown to the Plaintiff and his colleagues. The anomaly was however causing a significant performance degradation in the Verizon cellular network and was therefore of great interest to myself and my colleagues. The plaintiff discovered that the anomaly was being caused by a single parameter setting of the switching systems (referred to as (t_drop_int), meaning "threshold drop intercept") and I proposed a test on the Verizon network, in a single US city, to modify the parameter and observe the change in system performance. The test was approved by Verizon and executed, however the test was sabotaged such that there was no change in system performance. I was subsequently able to show that the system parameter had not been modified in the test city, however all Verizon and Nokia personnel that I had been working with on the test stopped responding to me and the test was abandoned.

5: Following this event, I was internally blacklisted and not allowed to advance further in my career. Specifically, during the period 2010-2015, as cellular phones were evolving from 3G to 4G, all of my work in the new 4G system was blocked and I was blacklisted from joining any new 4G projects. The 3G system was however critical to US cellular phone service and my expertise in the system was greatly needed by Nokia at this time. I believe that Nokia intended to retain me as an employee until I was no longer needed to maintain the 3G system and then to place me in the next company wide RIF (reduction in force) that occurred, which typically happened annually or bi-annually.

6: By 2018, the 3G system was no longer the primary system in the US and my career had devolved to the point where I was working as a maintenance technician and I had become adversely affected by these events to a great extent. In May 2018, following the anomalous

United States District Court
Northern District of Illinois

cancellation of yet another 4G project that I had proposed, the Plaintiff went on a short term

disability leave due to the stress and duress caused by my ongoing career decline.

7: At that time, I filed an internal ethics complaint. Nokia, as a large public corporation, is

subject to the Sarbanes Oxley law that requires them to implement a publicly accessible system

for employees to report ethics complaints and requires that the company respond to the

complaints. The Nokia in house counsel took my complaint in May 2018, and subsequently

responded, in July, that there was no evidence of wrongdoing related to my 2018 project,

however in attempting to explain the details that I had given in my ethics complaint, they

divulged further information that allowed me to tie the events of 2018 to earlier anomalous

events in 2014 and 2015.

8: Concurrent with the above developments, reports began to appear in the media about an

FCC jurisdiction lawsuit regarding changes to Universal Service Fund subsidy that resulted in

Jan 2017, then Ajit Pai became Chairman of the FCC and he enabled the (acam) USF

subprogram. The lawsuit was between the large telcos (Verizon, Sprint, AT&T, and T-mobile)

and a coalition of small telcos based in rural Oklahoma. Details reported of this lawsuit that

were reported in the media allowed the Plaintiff to associate my cancelled 2018 project with the

matters detailed in the FCC lawsuit and the Universal Service Fund subsidy and to better

understand the nature of the wire fraud being committed.

9: In late Aug 2018, I began sending daily emails with details of this fraud and the association to

my 2018 canceled project to senior company managers. Following an email on Aug 31st,

2018, that implicated a VP level executive at a separate US owned company named Lucent

United States District Court
Northern District of Illinois

Government Services  (that does security related projects on the US cellular phone systems),

Nokia took multiple actions against the Plaintiff that are in violation of Federal and State

whistleblower laws, including:

- a verbal threat delivered by telephone that my remaining disability benefits would be cut
  off if I did not "stop sending emails to everyone"
- my computer and network access being disabled
- my building access being cancelled
- a telephone call on 19 Sept 2018 from a woman at Nokia, possibly the in-house counsel
  posing as a Nokia disability nurse, to my treating FMLA healthcare provider to leave
  excessive negative feedback about my mental state prior to the healthcare provider
  returning a "return to work assessment" that was required for my return from my FMLA
  short term disability leave.
- terminating me in Nov 2018 when my short term disability benefits expired.
- Additionally, one of the named defendants, Neil Bernstein,  may have been seen by the
  Plaintiff in a parked and running car behind the Plaintiff's  house in March 2019 during
  discovery of the DOL trial.   The car was noticed twice over a five minute interval and
  then sped off when the plaintiff stepped out of his back door and waived to the driver.

10:  In Oct 2018, the Plaintiff filed an OSHA complaint, claiming standing for SOX and CFPB

whistleblower violations.  In a 30 minute phone call with the OSHA investigator, Shawn

Harrington,  on the day after I filed my complaint,   I was told that my complaint needed to go to

an Administrative Law Judge at the DOL, and that the quickest way to do so was for the OSHA

investigator to deny the complaint on that day, and that 30 days after the denial, I could request

United States District Court
Northern District of Illinois

a "SOX kickout" and move the case the the Dept. of Labor. The OSHA inspector told me that

this procedure would satisfy the SOX requirement that I exhaust my administrative remedies

with OSHA before advancing the matter to DOL.

11: In Nov 2018, the plaintiff requested this SOX kickout and filed suit in the Dept. of Labor.

The plaintiff issues an amended complaint [Attachment A] in Feb 2019 and discovery ended in

Dec 2019 and motions for summary judgement were submitted in Feb 2020. In June 2020, the

DOL court ruled on motions for summary judgement that the plaintiff had not successfully

argued for standing under SOX or CFPB [Attachment B]. The DOL court overtly did not

consider my arguments for standing in the most favorable light to the plaintiff, and thus the

Plaintiff is moving the case to the Northern District of Illinois at this time.

Jurisdiction

----------------

12: The plaintiff claims standing under the whistleblower protections of the Sarbanes Oxley and

Consumer Financial Protection Bureau statutes. The Plaintiff is allowed to remove the existing

SOX/CFPB DOL case to Federal District court anytime after 180 days of filing a complaint with

the DOL and before the Sec. of Labor issues a final decision. The ALJ ruling on standing was

made on June 26th [Attachment A] and becomes the final decision of the Sec. of Labor after 14

days of the ALJ's ruling which is on July 11th, 2020.. This lawsuit is thus filed within the

allowed time window to remove the case from the DOL.

United States District Court
Northern District of Illinois

12A:

The SOX statute states:

**18 U.S. Code § 1514A.** Civil action to protect against retaliation in fraud cases

**(1)**to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, _1343,_ 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

**(C)**a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

The plaintiff will show that the defendants took retaliatory action against me after I reported evidence of wire fraud, which is a violation section 1343 above.

12B:  under the Consumer Financial Protection Act of 2010 (CFPA):

**§1057. EMPLOYEE PROTECTION.**

(a) In General - No covered person or service provider shall terminate or in any other way discriminate against, or cause to be terminated or discriminated against, any covered employee or any authorized representative of covered employees by reason of the fact that such employee or representative, whether at the initiative of the employee

United States District Court
Northern District of Illinois

or in the ordinary course of the duties of the employee (or any person acting pursuant to

a request of the employee), has -

(1) provided, caused to be provided, or is about to provide or cause to be provided,

information to the employer, the Bureau, or any other State, local, or Federal, government

authority or law enforcement agency relating to any violation of, or any act or omission that

the employee reasonably believes to be a violation of, any provision of this title or any other

provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard,

or prohibition prescribed by the Bureau;

12C: The Plaintiff will argue that he is a "covered person" under the CFPB statute because he

was an employee of a subcontractor (Nokia) to a "service provider" (the large telcos) of a

consumer financial product.   The Plaintiff will additionally argue that the $1.50/month fee on

every US phone bill qualifies as a consumer financial product under the law.

13:  The plaintiff claims standing under the whistleblower protections of the False Claims act

because the underlying matter is related to a false claim being made to the government.  Under

(31 US 3730 (h)(1)):

United States District Court
Northern District of Illinois

Relief From Retaliatory Actions.—

(1)In general.— Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section *or other efforts to stop 1 or more violations of this subchapter.*

The Plaintiff will give technical details that show that  my attempts, beginning in 2009, to correct the (t_drop_int) parameter, would have affected the false claims being made to the government, and thus my actions  constitute an "effort to stop 1 or more violations" of the False Claims Act.

14:  This plaintiff will also claim standing under  Illinois Whistleblower Act, (740 Ill. Comp. Stat. 174/15) which explicitly provides for a relaxed burden of proof, ie the employee must only have a  "reasonable cause to believe that the information discloses a violation of a federal law, rule,

United States District Court
Northern District of Illinois

or regulation".

```
(740 ILCS 174/15)
Sec. 15. Retaliation for certain disclosures prohibited.
    (a) An employer may not retaliate against an employee who
discloses information in a court, an administrative hearing, or
before a legislative commission or committee, or in any other
proceeding, where the employee has reasonable cause to believe
that the information discloses a violation of a State or federal
law, rule, or regulation.
    (b) An employer may not retaliate against an employee for
disclosing  information  to  a  government  or  law  enforcement
agency, where the employee has reasonable cause to believe that
the information discloses a violation of a State or federal law,
rule, or regulation.
(Source: P.A. 95-128, eff. 1-1-08.)
```

14A:  The plaintiff will additionally claim standing under the Illinois Whistleblower Act for events

dating to 2010, specifically:

(740 ILCS 174/20.1)

Sec. 20.1. Other retaliation. Any other act or omission not otherwise specifically set

forth in this Act, whether within or without the workplace, also constitutes retaliation by

an employer under this Act if the act or omission would be materially adverse to a

reasonable employee and is because of the employee disclosing or attempting to

disclose public corruption or wrongdoing.  (Source: P.A. 96-555, eff. 8-18-09.)

United States District Court
Northern District of Illinois

The plaintiff will present evidence that on multiple occasions, starting with my 2009 Verizon test and leading through to my 2018 canceled project, that my actions would have disclosed evidence of public corruption (wire fraud to inflate subsidy payments), and therefore qualify as an "attempt to disclose wrongdoing", and that I was vigorously and personally retaliated against as a result and that I therefore have standing under (740 ILCS 174/20.1).

Parties

--------------------

15: Ken Del Signore

A former physicist at Fermi National Accelerator Laboratory that moved to Nokia (then called Lucent) in 1999. I was in a group of approximately 50 physicists that moved from FNAL to Lucent in the late 1990s. I worked as a software developer for 4 years and then advanced into an architecture position. Between 2003 and 2010, I proposed and developed a series of technically and financially successful projects on the company's 1x voice and 3G data systems[2].

---

[2] 20130059582 Adaptive User Equipment Registration for Communication Networks
20100120451 Method for paging a mobile unit based on previous network interactions
20090093263 Conservation of paging resources in a mobile switching center
20080161007 VACATING LOW USAGE PACKET DATA SESSIONS IN A WIRELESS COMMUNICATION SYSTEM

United States District Court
Northern District of Illinois

Additionally, in 2007 and 2014 I published articles in Bell Lab Technical Journal regarding my

R&D work in telecommunications[3]

16:  Carl Spies,  my manager at the time of the 2009 Verizon test.   In 2004, Carl and I had

invented a major architectural feature called "adaptive paging".   One of the benefits of this

feature was that it reduced voice call setup time to a cellular phone by 5 seconds on

approximately 2 million phone calls per day (which shortens the wait of the person making the

call).   By 2009 I was working largely unguided by Carl, however after I began working on the

Verizon test in late 2009, Carl said to me "I need to know what you are working on".

17:  Ming Hsu-Tu,  my manager from 2010 to 2013.  I was demoted from Carl's group to Ming's

group in 2010 (Exhibit L, p. L72).   Ming also made the statement to me "I need to know what

you are working on".    I believe Ming was aware of the blacklisting and did his best to mitigate

damage to my career, including helping to get my 2014 Bell Labs Technical Journal article

approved for publication.

---

20080161004 ALLOCATING MEMORY TO LOW USAGE PACKET DATA SESSIONS IN A WIRELESS
COMMUNICATION SYSTEM
20080101316 Method of excluding ineffective inter system page attempts 20070293245 Conservation of
paging resources in a mobile switching center
20070281661 Method for determining if a mobile unit is transient
20060293037 Method for alerting a mobile unit of a missed call upon movement of the mobile
20050130624 Generating one or more triggered operations to prepaid service node based on connection
with intelligent peripheral component
[3] http://onlinelibrary.wiley.com/doi/10.1002/bltj.20241/abstract
http://onlinelibrary.wiley.com/doi/10.1002/bltj.21651/abstract

United States District Court
Northern District of Illinois

18:  Kevin Menke, my manager from 2013 to 2015.  I was demoted from Ming's group into

Kevin's group in 2013 and I barely ever had any interactions with him until an event in 2014

described herein as the "bicycle meeting" in which Kevin attempted to goad me into an

insubordinate public response which I believe would have been used as a pretext to fire me.


19:  Neil Bernstein,  Kevin Menke's manager.  In 2015, after I had proposed repeating my

(t_drop_int) test from 2009, Neil attempted to fire me with a second attempt at goading me into

an insubordinate public response, described herein as the 1.5 sigma meeting.  I first met Neil in

2013 when he was promoted to be Kevin's manager.


20:  Chris Miranda,  a senior executive at Lucent Government Services.  Chris was a manager

parallel to Carl Spies at the time I was in Carl's group and we knew each other.   Chris left

Lucent in 2006 and became a VP at LGS.  At the time Chris knew me,  I used to send April

Fools Day jokes company wide on an internal messaging system, but I stopped doing so around

2008.    I believe Chris authorized an April Fools Day joke job offer to be sent to me on Linkedin

from an LGS recruiter on  April 1st, 2016, five months after I had been demoted from Kevin

Menke's group into a "tester" position in a separate department from Neil's.   It was a copy of

this fake job offer that I shared in an email on Aug 31st, 2018 that provoked a panicked

response by Nokia that  resulted in the first listed charge below for a telephone threat that was

made several hours afterward the email was sent.


21:   Christi Gliori,  a Nokia disability advocate nurse that was assigned to me when I went on

short term disability in May 2018.    Christy delivered the telephone threat to me on Aug 31st,

after I exposed the LGS april fools day joke.  In this call she seemed nervous, like she had just

United States District Court
Northern District of Illinois

been in an urgent meeting. Additionally, Nokia has submitted an electronic log to the DOL court

as part of motions for summary judgement that details a telephone call on Sept 19th, 2018,

between Christi and my treating FMLA healthcare provider, Kara Mulligan, in which Christy

gives Kara excessive negative feedback about my mental state. Details of my clinical visit from

May 2018 also appear in the log of this same phone call and Kara Mulligan denies divulging this

information. It appears that Nokia obtained my FMLA medical records from MetLife after they

were submitted as part of my short term FMLA medical disability and that the electronic log was

falsified using information from those medical records. The nature of this call is highly derisive

to the Plaintiff, as confirmed by Kara Mulligan, and it would be highly unusual for a professional

nurse to have such a conversation. It is more plausible that the log was either falsified

afterwards, or that Christi was not the person actually talking to Kara Mulligan.


22: Sonya Zeldone, Nokia's former "lead compliance counsel for the Americas Region", until

approximately Nov 2019. Sonya handled my ethics complaint in 2018 and was responsible for

divulging additional details to me that allowed me to piece together the fact that the adverse

career events I had experienced since 2010 were all related. Sonya lost her employment at

Nokia in Nov 2019 after the ALJ Judge allowed discovery to end in my DOL suit. It appears

that Sonya was not aware of the nature of the matter underlying my ethics complaint and did not

know that I would have standing under SOX/CFPB/False Claims, and she took overt actions

that violated the employee protections in these statutes. I believe Sonya falsified the electronic

log of the telephone call to Kara Mulligan in order to establish a defense against my termination.

She may have also been posing as Christy in the call to Kara Mulligan, as Kara confirms that

the caller made multiple derisive statements about the Plaintiff, and this would be a highly

implausible action for Christy, who is a professional nurse, to take.

United States District Court
Northern District of Illinois

23: Brett Behrens, my "tech team lead" from 2015 to 2017. I was laid off by Kevin Menke in September 2015, but was offered a demotion into Brett's team at the layoff meeting, which I eventually accepted. As soon as I entered Brett's team, I was told that large additional layoffs were coming and I should start looking for other jobs in the company immediately. I believe now that I was only offered the demotion into Brett's team because of the anomalous behaviour of Neil Bernstein regarding the attempt to goad me into insubordination and other events, and that Neil was worried I would file a wrongful discharge suit.

Brett is one of only a few of my former colleagues that will still communicate with me. I spoke to Brett immediately after Christy made the telephone threat and described it to him and he has signed a sworn statement to such [Attachment E].

Allegations

----------------

24: These allegations have been fully described in the DOL Feb Complaint [Attachment A] and associated "Exhibit L", [Attachment C] and will be repeated here and condensed, drawing heavily from the material developed during the previous discovery in the DOL case.

25: There are two different forms of wire fraud being committed that correspond to two separate subprograms of the USF. The plot below shows that funding to these two subprograms is increased or decreased depending on which political party controls the White House.

United States District Court
Northern District of Illinois

25a: The plot ( from Exhibit L, p. 14) shows payment data from the USF subsidy broken down by sub-program.  The plot  was generated from USF payment data as described in exhibit K) of the Feb complaint.  As can be seen, there are large sudden and persistent increases and/orr decreases in the USF subsidy payouts in the summer of 2004, Feb 2009, Nov 2009, and Aug 2015.



USF high-cost-program subsidy payments 2003-2018

United States District Court
Northern District of Illinois

26: A plausible explanation, as described in (Exhibit L [L-28] ),  for the 50 million dollar per month increase in 2004 was that the (t_drop_int) parameter was changed in the Verizon network, and possibly others, and that this caused an immediate nationwide increase in roaming counts, which where then reported to the government to cause the increase in subsidy payments.

27:  The (t_drop_int) fraud works by causing increased numbers of cellular phone roaming operations between the large and small telcos service areas (Exhibit L, p. L-28).  Notionally, a roaming operation between a large telco and a small telco implies that a cell phone user is in motion and has crossed between two service areas. However this is not the only scenario that will generate roaming operations. In 2009, I had found that the incorrect (t_drop_int) parameter setting was causing  stationary cell phones that are in RF contact with two towers, or two cells on the same tower, to produce approximately half of all 3G roaming operations in the Verizon network, nationwide.

 

United States District Court
Northern District of Illinois

28:  The second form of wire fraud involves a second technical mechanism (Exhibit L, p. L-45). Roaming gaps on highways have been programmed into the cellular switching systems such that the phones traveling on these highways are forced to roam to a small telco's network for a short distance, and then they roam back to the large telcos network.   The small telcos then turn in counts of these roaming operations for USF subsidy reimbursement.

These gaps were easily visible on commercial heatmap systems that measure network ID and RF signal strength.  This wire fraud mechanism is described in Exhibit L, and the (Feb. Complaint, Exhibit J)


29:  In the example shown below,  the gap labeled "a" is first seen on  a heatmap of  RF measurements in the AT&T network at a scale of about 200 miles (leftmost image).  As can be seen in the second image from the left, there is an associated small telco, "Nex-Tech" that provides service in the gap.   Zooming in to a much smaller scale on the two rightmost images, to approx 10 mile scale, it can be seen that the gap in the AT&T market 100% excludes any AT&T subscribers from receiving service from AT&T in the gap, which is a small town.   It can also be seen that the small telco Nex-Tech provides uninterrupted service to the town and people traveling on the roadways.  Exhibit J of the Feb complaint has multiple additional examples, however, this commercial heatmap tool used to make these images has been taken taken offline for PC browsers and now only offers limited data display on the mobile app version of the tool such that the gaps are no longer visible,  Exhibit L, p L-63 -> L-65.

United States District Court
Northern District of Illinois



30: The USF payment data plot above (p. 25a) shows a sudden $60 million dollar per month increase in the summer of 2015, after the democratically controlled FCC chairman turned on a newly legislated subprogram of the USF called the "Connect America Cost Model" (cacm). The (cacm) program was part of bi-partisian legislation dating to 2012 that also included a subprogram favored by the Republican party referred to as the "Alternative Connect America Model" (acam).

31: Exhibit L (p. L-45) details that the majority of this $60 million dollars per month went to 7 battleground states, and that increase went to only 2-3 small telcos in each state.

United States District Court
Northern District of Illinois

32:  Between  2010 and April Fools Day 2016,  and then again between Jan and Nov 2018,  I experienced a series of anomalous and egregious  work incidents affected on me by multiple managers and colleagues.  I believe this harassment was based on two underlying causes.

33:  The first cause is that on three occasions between 2010 and 2015 I had found performance problems in the nationwide 3G EVDO wireless networks due to specific system parameters that affected handoff rates.   At each time, the system performance problems were  of sufficient importance that I was able to get my existing management chain to approve field trials of my proposed parameter changes, however these field trials all ended with anomalous test results, and strange behaviour from colleagues, including two incidents of severe  public harassment in 2014 and 2015 from two separate managers in which I believe the intent was to goad me into an insubordinate public reaction which could have used as a pretext for dismissal.  I now suspect that my proposed 3G system changes would have affected the handoff rates in the 3G networks and would have altered the service counts of any small telcos that were using these counts in their annual FCC filings.

United States District Court
Northern District of Illinois

34   I believe the second cause of the harassment I received was due to my ongoing research work, starting in 2013, with several 3rd party companies that were developing smartphone based test systems for testing the performance of the nationwide wireless networks;  followed by a similar period of harassment in 2018 due to my attempt to develop a similar (and greatly improved) test system through a Nokia business incubator program.   It appears that around the spring of 2014, all commercial research and development was halted on the leading 3rd party measurement systems; presumably because these systems can detect a second form of wire fraud that was implemented in 2015 as part of the Democratic USF funding mechanism known as the Connect America Cost Model program.

35   The initial set of egregious work incidents only stopped after I had been demoted from an architecture position to a lab tester position in Nov 2015.    I have strong reason to believe that the last incident was a fake job offer from LGS, sent to me subsequently on April Fools Day 2016; initiated by Chris Miranda (who is a VP at LGS), as a victory dance on the grave of my career, four months after my demotion.

36   These egregious work incidents resumed starting in Jan 2018 and continued through Nov 2018, at which time I was terminated.  I had continued to develop the design of a smartphone based measurement system (still completely unaware of the industry wide prohibition and the USF subsidy program) and in Sept 2017, I submitted the latest version of the project, first called PMUD then Shannon,  to the Wireless Design Innovation Accelerator  program.  It was initially accepted and vigorously supported,  due to an expected profitability of > $2M / year, and then around the end of January 2018, it became just as vigorously "not-supported".   I was never told

United States District Court
Northern District of Illinois

that the project was cancelled, but instead was sent on a series of very public wild goose

chases that I believe were intended to be publicly humiliating; as a warning to others to avoid

this work,  similar to the previous public incidents in 2014 and 2015.


37   It should be noted that my yearly corporate goals included the topic of smartphone based

measurement topics, going back to at least 2008 (iirc),  and that these goals were approved by

my management chain each year.


38   My inability to advance in career, coupled with the public and seemingly personal

harassment starting in Jan 2018, led me to take a medical leave on May 7th for a "work related

stress injury".   I was driving home from work that Friday and had become depressed and was

very lost in thought on this matter and almost pulled in front of an oncoming car at a right turn on

red.  When I got home I sent an email to my manager stating that I needed to go on a disability

leave.  I remained on the STD leave for six months and was eventually terminated from the

company on Nov 7th as described below.


38:  Between May and Aug 2018, while on short term disability leave, I was able to determine

that the cause of my career decline was related to the fraud in the USF as described above and

also in the Feb complaint (p.  100 -> 116).  By August 27th, the Nokia counsel had ceased to

respond to me.

United States District Court
Northern District of Illinois

43:   I had been aware of my career decline for many years but did not understand the cause of

it.   When I learned in June that the events that started in 2013 were all connected, it felt as if a

ten pound weight had been lifted off my head, that I hadn't known was there.   However, this

matter greatly concerned me in that I was exposing billions of dollars in fraud and that there

were likely many people who could be affected if the fraud were revealed.

43a   At this time I was still unaware of my potential OSHA legal remedies,  therefore I decided

that the best course of action was to establish a witness list of people internal to the company

and begin emailing the evidence I had and was continuing to develop.

Aug 27th

44   Over the week starting  Monday Aug 27th, I began sending out daily updates of my new

discovery to the  witness list.   This information was completely unknown to everyone on the

witness list, all of whom each have decades of telecom experience.

45   Also during this week, my daily entireties to Nokia council for a further meeting (to continue

discussing the constructive termination agreement I had asked for at the first meeting in June)

went ignored  each day until Friday morning, Aug 31st,  at approx 6:50am, when I recalled the

April Fools Day communication from LGS in 2016 and sent a screenshot of it to the witness list,

wondering aloud in the email if it was related?

United States District Court
Northern District of Illinois



<u>Aug 31st - Friday - threatened by corporate officers for engaging in a SOX protected activity</u>

46   I believe the LGS April Fools Day  email  provoked a panicked response  which resulted in

my getting a call from Christy several hours later.    She seemed to me in an urgent manner and

mood, and she conveyed to me the statement  ~"they said  tell him to stop sending emails to

everyone".     Christy, who has been a great help but not exactly easy to get a hold of quickly on

administrative matters, started the call with an unrelated administrative question, which I'm

United States District Court
Northern District of Illinois

assuming was coached.  She then changed subjects and  relayed to me that she had just been

in a meeting (which I'm assuming accounted for her urgent manner) and also conveyed to me

the message that they said I was endangering my disability benefits by continuing to send out

emails about an ethics complaint that had been closed.

47   Several minutes after Christy's call, I realized that this was a wet noodle threat and that

there was likely someone at LGS involved.   After several more hours of talking with colleagues,

Chris Miranda's name was mentioned as someone who could have affected the April Fools Day

joke due to his position as a vice president at LGS.

49   Later this same day, at approximately 4:00 pm, the Nokia counsel Tim Mclain, emailed me

saying that he and Sonya (the other Nokia council) were both taking vacation the following

week, but that they would set up a meeting with me for the week after that.

50   I was at first relieved, but as I thought about this message some more, it occurred to me

that this was an extremely odd action to take by Nokia council.   I had just learned 1 week

earlier that the five years of harassment  was not a false advertising scheme, but rather it

concerned billions of dollars in tax subsidies and many people could potentially lose many illicit

gains.  Then five hours earlier at 11:00am,  I discovered that LGS was involved and that I knew

the main perpetrator and that he lived near me.

51   This caused me alarm;   after as much trouble as the perpetrators of this scheme had gone

to keep me from understanding what had happened to me, it did not seem logical that five hours

after I figure out the name of possibly the main perpetrator, that I'm told to sit tight and wait for a

United States District Court
Northern District of Illinois

week, and they didn't even schedule a follow up meeting. Consequently I continued to email out daily discovery and analysis.

5 Sept

52    I was continuing to discuss this matter with colleagues and developing further discovery through Weds of the following week when my corporate laptop was disabled and my badge access canceled. This occurred while I was in the building complex at Naperville. I had gone in to work to discuss this matter with several people, proposing the possibility that I return to work into the Wireless division in a capacity related to my cancelled "Shannon" project from early 2018. It was on this day that the name Pioneer Telecom was mentioned to me by a senior executive when we were discussing the FCC lawsuit and it's relation to my Shannon project. When I left the building, my badge beeped as normal, but a door alarm went off when I exited. When I got home, my laptop would no longer allow me to log in.

53    Following these events, my goal was to write and submit a new ethics complaint. Without corporate network access I could not find the link to the external ethics complaint site. Fortunately I was able to send an email to Tracy Couture, one of the Naperville HR Ombudsmen, and she supplied me the link. I submitted an earlier version of this document as a new ethics complaint approximately two weeks later [Feb Complaint Exhibit I]. This internal

United States District Court
Northern District of Illinois

complaint makes the demand that the company self report to the relevant government agencies,

FCC, DOJ, FTC, CFPB, SEC, etc…    I received the reply below on 3 Oct:

---

## Ethics Complaint by Ken Del Signore against Nokia and Lucent Government Services ➤ Inbox ✕

**Alesia, Joe (Nokia - US/Naperville)** <joe.alesia@nokia.com>
to me, Tracy ▾

Oct 3, 2018, 11:51 AM ☆ ↩ ⋮

Hello Ken –

By way of introduction, I am a Senior Investigations Counsel on Nokia's Business Integrity Group. I was assigned to conduct an investigation of the concerns you raised in September (see your attached complaint). I am writing to inform you that we have concluded our investigation. The evidence does not substantiate the concerns you raised.

If you have any questions or concerns, please feel free to contact me at any time.

Regards, Joe

Joe Alesia
Senior Counsel
Business Integrity Group, Nokia

---

 **Ken Del Signore** <kendelsignore@gmail.com>
to tracy.coutre ▾

Mon, Oct 1, 2018, 12:16 PM ☆ ↩ ⋮

Hello Tracy,
   I'm writing with an update to my situation. I'm not sure what else to do. I believe I have uncovered significant anti trust violations in the telecom industry. The Nokia lawyers are complicit in the scheme and have actively tried (unsuccessful) to prevent me from learning the details, including threatening to cut off my disability benefits "if I kept sending email to people about an ethics complaint that is closed."

   I've submitted my ethics complaint to multiple federal regulatory agencies including OSHA for the benefits threat. It appears to me that Nokia, LGS, and other telecom companies could be facing significant anti trust fines stemming from this complaint.

For myself, I see three options,
  go back to NOKIA as a help desk technician and await next RIF
  sue NOKIA and LGS for harassment and loss of career
  go back to Nokia and build the Shannon app.

I would prefer the third option and I have stated as much to the Nokia lawyers.

I don't know if there are any remaining ways you can help as the ombudsman, but I'm otherwise out of options. I do not think returning under the conditions that I left would be fruitful, so it looks to me right now like I am being forced into the second option.
thanks
Ken

PS ironically, while on disability I took the ethics course online. I could annotate a counter example to almost every item discussed in that presentation.
***

United States District Court
Northern District of Illinois

54   By this time I had learned of the potential OSHA / SOX / DF  remedy available to me,

therefore following this message, I determined to file an OSHA complaint and proceed with a

SOX harassment action.    I requested of my manager, the new council Joe, and also Tracy if

my laptop could be turned on so that I could fully document my complaint, also telling them that

I considered my activity to be a protected activity under SOX.   My request was denied by Joe,

as a result all dates are approximate.   Additionally  I sent my initial ethics complaint to multiple

federal agencies' tip lines as an email.



55   Around  the third week of Oct, with ~ two weeks left on my short term disability benefits,

Christy notified me she had scheduled two 8 hour mental health examinations in downtown

Chicago on two weekdays in early November (with a company called "IMX")  and that I had to

attend and pass this testing in order to return to work.   She also told me "don't worry, you will be

able to take breaks"

56   I had previously indicated to Nokia council  in my second ethics complaint  that if they did

not remediate the underlying issues with the Shannon project, including self reporting to the

United States District Court
Northern District of Illinois

government, that I would initiate a federal action. I therefore took this recent IMX testing

requirement to be an attempt to dissuade me from returning to work from short term disability.

Additionally, it does not seem plausible that Nokia council was hoping I would pass this testing

so that I could return to work as a service desk technician (who is not allowed to advance in

career). Furthermore, I felt this testing would give Nokia 16 hours of material to use against

me in any subsequent federal legal actions, therefore it was my belief that they would have told

me I failed the testing regardless of my performance on the tests.

Telephone Contact Between Nokia and Kara Mulligan on 19 Sept 2018

-------------------------------------------------------------------------------------------------

57: In Jan 2020, in motions for summary decision in the DOL suit, Nokia voluntarily submitted

incriminating evidence of the 19 Sept 2018 telephone call to Kara Mulligan. This evidence was

submitted in the form of an electronic log of Chriti's interactions with me over the six months that

I was on short term disability [Attachment D]. The log entry for the 19 Sept telephone call is

shown below.

United States District Court
Northern District of Illinois

Disability Medical Notes for Kenneth Del Signore, 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
Printed: 02/27/19

USER-Christy Gliori DATE-09/18/18 TIME-15:13:26 CDT
TC from Kara Mulligan MD and she reports that she has seen my letter and is
calling to discuss.
She did leave messages but I have not rcd these. She advised me that She has
only seen pt on 5/24/18, 6/28/18, and 8/23/18.
She states that he is treated with medication via his pcp however he only is
taking Zoloft. She has attempted to perscribe meds but he will not take any from
her. She confirms that he is "psychotic and delusional". His behaviour is
"bizzare" but she also does not have a baseline. I advised her of my contact
with him along through STD and the seeming escalation of his obsessive thoughts
and behavior. Advised that I cannot seem to get him to separate STD and work
issues and she confirms that this is not possible with the delusions that he
has. Discussed NP IME and she feels this is an excellent idea. I discussed his
possible reactions and she states that no one can help how he may or may not
react however it would be best to attempt the IME since he certainly cannot be
returned to work in his current state. She said that he seemed to want to go to
a different position. I advised her of what he has shared with me about being
paid to leave etc. Also that he has mentioned another job but that cannot happen
and would not resolve his issues of inability to rtw and current condition.
She states that in her office, he paces and will not sit and discussed his
obsessive thoughts about his work issue and he does appear very intelligent but
due to lack of baseline, she cannot tell if he has insight into his psychiatric
state.
He does have family history of a brother with schizophrenia as well as another
family member with psych dx.
She also confirms he has been psychotic since the first time she saw him and has
had no change. She agrees to have her staff contact him to attempt to have him
come in so she can eval and try to "sell" him on the idea of an antipsychotic
again but she has no way to know for sure if he will do so. I did advise Doctor
that she may let him know we spoke.

I will attempt to obtain 010 from his pcp via email to him with form and
request.
Will then discuss IME with team and request this as needed.
DSR sent to mgmt with request for a copy of Job Description and MetLife form in
case he may need LTD.
FU PRN.

58: The log entry for this phone call is completely out of character with all of the other log

entries Christi made over the six month period I was on short term disability. Christi is a

professional disability nurse practitioner, who would not have made such derisive comments to

another professional nurse practitioner, without having HIPAA authorization, and prior to the

second nurse practitioner completing a return to work assessment for a patient under her care.

Kara Mulligan has subsequently confirmed that the telephone call had an excessive negative

tone regarding my condition, however she denies making the statements attributed to her in the

log.

United States District Court
Northern District of Illinois

Sonya Zeldone  ceased to be employed at Nokia sometime around November 2019, following a

pre-hearing telephone conference with the ALJ judge in which the phone call to Kara Muligan

was identified as a main charge of discrimination under SOX and CFPB.

59:  Charges

------------------

1. On August 31st, 2018[4], Cristi Gliori called the plaintiff and delivered a threat to my
   remaining short term disability benefits, saying that  "if I continued to send email out
   about an ethics complaint that has been closed, my short term benefits could be cut off"
   - The Plaintiff argues that this verbal threat is a prohibited  act of discrimination
     under the Illinois Whistleblower Act, SOX, CFPB, and The False Claims Act.

2. This threat did not stop the plaintiff's daily emails, which continued until Sept. 5th 2018,
   at which time Nokia disabled the plaintiff's work laptop and also cut off the plaintiff's
   building access.
   - The Plaintiff argues that this disabling of the plaintiffs laptop and building access
     was a prohibited act of discrimination  under the Illinois Whistleblower Act, SOX,
     CFPB, and The False Claims Act.

3. On Sept 19th, 2018, a telephone call took place, without any HIPAA authorization,
   between a woman from Nokia alleging herself to be Christi Gliori and who gave
   excessively negative feedback regarding my mental state to my treating FMLA health
   care provider Kara Mulligan, prior to my health care provider completing a return to work
   assessment that would have cleared me to return to work from my FMLA short term
   disability leave.

---

[4] several hours after the plaintiff sent the email implicating Chris Miranda at Lucent
Government Services.

United States District Court
Northern District of Illinois

- The Plaintiff argues that this telephone call was a prohibited act of discrimination under the Illinois Whistleblower Act, SOX, CFPB, and The False Claims Act.

4. In Nov 2018 the Plaintiff was terminated from Nokia because I had reported evidence of wire fraud and false claims being made in order to affect subsidy payments from the Universal Service Fund subsidy.
   - The Plaintiff argues that the termination violates protections under the Illinois Whistleblower Act, SOX, CFPB, and The False Claims Act.

5. Starting in 2010, the plaintiff was internally blacklisted and not allowed to advance in career because I had attempted, on three occasions, to correct the (t_drop_int) parameter, as described herein, and that that action would have alerted federal authorities to the ongoing wire fraud.
   - The Plaintiff argues that my acts constitute an attempt to disclose public corruption under (740 ILCS 174/20.1).
   - The Plaintiff additionally argues for standing under SOX, because I became aware of the nature of the 2009 harassment in Jan 2019, after the matter had been advanced from OSHA to the DOL and included the charge in an amended complaint for the DOL court in Feb 2019. The SOX statute stipulates that the 180 day statute of limitations applies from the time the plaintiff became aware of the violation.

United States District Court
Northern District of Illinois

60: Requested Relief

------------------------

61: The Illinois Whistleblower Act, SOX, CFPB, and The False Claims Act all stipulate that the
affected employee be made whole. The False Claims Act also has a factor of two multiplier for
lost pay. However, since 2010, I have been greatly affected by this matter such that financial
compensation will not make me whole for the personal damage suffered during this ordeal.

62: For the purposes of estimating financial damages, a reasonable assumption would be that I
will not be able to work in my professional career at Nokia, nor will I be able to work in telecom
in the same capacity that I would have had the blacklisting not occurred. Several other
considerations are:

- At the time I was terminated, my total annual compensation was approximately 128K,
  including salary, bonus and health care premiums.
- At the time I was terminated I was 52 years old and had 15 years left until retirement age
  of 67.
- At the time I was terminated, I had not received a raise in 6 years.

United States District Court
Northern District of Illinois

63:  For the purposes of calculating an estimated salary had the blacklisting not occurred, the

plaintiff argues that the current listed base salary of $153K for a senior software engineer at

Lucent Government Services on the website glassdoor.com be used.   Average bonus and

healthcare premiums would raise this to approximates 170K;  multiplied by 15 years, yields an

estimated financial damage to the Plaintiff of $2.55M.  In principle, the False Claims charge

would double this value because it is all due to lost pay.    The plaintiff however is not bringing

this matter for some large numeric payout.   This matter has greatly affected me for over 10

years and I beg the court for any appropriate remediation as the Court deems fit.

Respectfully Submitted,

9 JULY 2020

Ken Del Signore
pro-se
1509 PAtterson Ave.
North Aurora, Il. 60542
630-346-2993
kendelsignore@gmail.com

United States District Court
Northern District of Illinois


64:  Attachments
------------------


Attachment  A:  February Complaint to the DOL ALJ

Attachment B:   ALJ ruling on standing issued 26 July 2020.

Attachment  C:  Exhibit L - this document was written during discovery after the main details of
the wire fraud were more fully understood.

Attachment  D:  electronic log of Cristi Gliori's interaction with the plaintiff from May-Nov 2018

Attachment E:  sworn statement of Brett Behrens regarding the telephone threat made on Aug
31st.